**UNITED STATES of America, Plaintiff,**

v.

**STATE OF NEW YORK, William G. Connelie, Superintendent, New York State Police, Michael M. Ruddy, Daniel Voght, James W. Haker, Brendan Moran, Keith A. Gutbrodt, Donald J. Hudson, Jr., James C. Cox, Michael D. DiCamillo, and Edward K. Ludlum, Defendants.**

No. 77–CV–343.

United States District Court, N. D. New York.

Sept. 6, 1979.

Griffin B. Bell, Atty. Gen. of the United States of America, Drew S. Days, III, Asst. Atty. Gen., Civ. Rights Div., U. S. Dept. of Justice, Washington, D. C., George H. Lowe, U. S. Atty., N.D.N.Y., Syracuse, N. Y., for plaintiff; David L. Rose, Teresa M. Holland, Thomas R. Bagby, Washington, D. C., Terrence M. Kelly, Asst. U. S. Atty., Albany, N. Y., of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, Albany, N. Y., for defendants State of New York and William G. Connelie, Superintendent, New York State Police, New York State Dept. of Law; John Q. Driscoll, Henderson G. Riggs, Joseph A. Romano, Asst. Attys. Gen., Albany, N. Y., of counsel.

## MEMORANDUM

JAMES T. FOLEY, Chief Judge.

This action was commenced on September 8, 1977, by the Attorney General on behalf of the United States of America against the State of New York and William G. Connelie, Superintendent of the New York State Police, alleging a "pattern or practice" of discriminatory employment practices with respect to blacks, Spanish-surnamed Americans, and women in depri-

vation of the full enjoyment of rights secured by Title VII of the Civil Rights Act of 1964, *as amended,* 42 U.S.C. §§ 2000e *et seq.,* the Omnibus Crime Control and Safe Streets Act of 1968, *as amended,* 42 U.S.C. §§ 3701 *et seq.,* the State and Local Fiscal Assistance Act of 1972, *as amended,* 31 U.S.C. §§ 1221 *et seq.,* and the Fourteenth Amendment to the Constitution of the United States. The Attorney General charges a pattern or practice of discrimination along with eight individual claims of employment discrimination in connection with the hiring and promotional practices of the New York State Police. In response, the State of New York and the New York State Police (hereinafter at times referred to as the "N.Y.S.P.") assert that they have not engaged in any purposeful discrimination and that they have utilized a validated examination for appointments to the entry-level position of trooper.

More than a year prior to the filing of the complaint herein, the United States Department of Justice notified the State of New York that an investigation had begun concerning the employment practices of the New York State Police. Thereafter, on July 20, 1977, the Superintendent of the New York State Police was informed that the Attorney General had authorized the filing of a complaint based on that investigation. Attempts at voluntary compliance or conciliation failed, in part due to a state court ruling, *Ruddy v. Connelie,* 89 Misc.2d 413, 391 N.Y.S.2d 819 (Sup.Ct.Albany County 1977), *aff'd,* 61 A.D.2d 372, 402 N.Y.S.2d 245 (3d Dep't 1978), which held that the New York State Constitution prohibited the appointment of state troopers from the current eligible list, established in June 1976 based on a competitive examination given in 1975, in any manner other than in strict compliance with its numerical order. *See United States v. State of New York,* 77–CV–343, at 2–3 (N.D.N.Y. November 18, 1977). Appointments to the New York State Police are made on the basis of merit and fitness from an eligible list established as a result of competitive examinations. *See, e. g.,* N.Y.Const. art. V, § 6; N.Y.Civil Service Law § 61 (McKinney 1973). The

nine individuals, white males, who had successfully challenged this effort by the New York State Police to hire members of minority groups without regard to the strict numerical order of the eligible list were subsequently joined in this lawsuit as parties-defendant. *See United States v. State of New York,* 77–CV–343 (N.D.N.Y. November 18, 1977); *United States v. State of New York,* 77–CV–343 (N.D.N.Y. December 23, 1977).

Within days after the commencement of this action a new class of troopers was scheduled to be sworn and begin training at the New York State Police Academy in Albany, New York. Plaintiff's motion for a temporary restraining order enjoining the New York State Police from appointing the members of this proposed class, who had already been sent appointment notices, was denied. This class of 156 troopers was sworn on September 19, 1977. Such appointments are made for a probationary period of one year after which time a trooper becomes a permanent appointee. 9 N.Y. C.R.R. §§ 475.1, 475.2 (June 27, 1962). Then, on October 25, 1977, in accordance. with the Omnibus Crime Control and Safe Streets Act of 1968, *as amended,* and pursuant to 42 U.S.C. § 3766(c)(2)(E) and (c)(3) the Court entered a preliminary injunction enjoining the United States from suspending payment of Law Enforcement Assistance Administration funds to the State of New York and enjoining the State of New York and Superintendent Connelie (hereinafter at times referred to as the "state defendants") from making any further appointments to the position of trooper until such time as this action could be heard on the merits and a decision rendered by the Court. *See generally United States v. City of Los Angeles,* 595 F.2d 1386 (9th Cir. 1979).

Upon applications on behalf of the state defendants, this order was modified on January 25, 1978, and on June 16, 1978, to permit and provide for the appointment and training of two trooper classes. The need for these appointments was based on, among other reasons, the expected attrition

rate in the force and the ·upcoming 1980 Winter Olympics to be held in Lake Placid, New York. The order of January 25, 1978, provided for the appointment of a class of 150 persons in rank order from the current eligible list but also directed that in addition there be appointed 12 qualified blacks, 8 qualified Spanish-surnamed Americans (hereinafter at times referred to as "SSA's"), *see* Finding of Fact No. 132, *infra*, and 4 qualified females. The order of June 16, 1978, provided for the appointment of a class of 100 persons in rank order from the same eligible list and, again, an additional 18 qualified blacks and Spanish-surnamed Americans and 12 qualified females. This order also terminated the future use of this eligible list. *See generally* N.Y.Civil Service Law § 56 (McKinney Supp.1978).

The trial of this action was concluded on July 21, 1978, after a total of 24 trial days. The submission with extensive briefs and detailed proposed findings of fact and conclusions of law necessarily took a long period of time before completion. Plaintiff's proposed findings of fact number 494, while the state defendants have submitted 477 proposed findings of fact and 78 pages of rebuttal to plaintiff's proposed findings of fact. There are a substantial number of proposed conclusions of law. The entire matter is now before the Court with jurisdiction predicated on 42 U.S.C. § 2000e–6(b), 42 U.S.C. § 3766(c)(3), 31 U.S.C. § 1242(g), and 28 U.S.C. § 1345. *See United States v. State of New York*, 82 F.R.D. 2 (N.D.N.Y.1978).

In the interim, on November 21, 1978, the Court entered an order permitting the State of New York and Superintendent Connelie to prepare, recruit, announce, and conduct an examination for the position of trooper solely for the purpose of appointing a single class consisting of 160 qualified persons including 40 qualified blacks and Spanish-surnamed Americans and 24 qualified females. This examination has, as of this time, been completed and was conducted in accord with general procedures that were recommended by the parties to this lawsuit and approved by the Court.

A case of this kind raises important, emotional, and complex issues touching upon the cross-cultural fabric of our society. The application of constitutional and statutory principles by a court cannot be expected to solve, even temporarily, all of the moral, social, and economic problems of a changing society. Nonetheless, such principles are flexible, and the ones pertinent here have been developed, interpreted, and applied in similar and in an increasing number of lawsuits of this nature. In exercising its responsibility "to announce its considered judgment," *United States v. Butler*, 297 U.S. 1, 62–63, 56 S.Ct. 312, 80 L.Ed.2d 477 (1936), on the legal arguments advanced in this litigation, the Court will do its best not to lose sight of the very basis for its existence—to administer justice according to law. It is fully realized that there will be strong dissatisfaction and disagreement by many with and resentment to the rulings and conclusions herein made. It should be recognized, however, that personal interests at times have to be subordinated in order that important state and national interests can be properly served under controlling laws. In a progressive society, inequities cannot be ignored on the basis that they were caused by the conduct of previous generations for which the present generation shall bear no responsibility.

In addition, I must note that no opinion on this matter could come near to incorporating all of the subtle and elusive factors underlying this action or attempt to announce proper procedures to be followed in validating an examination. I have been a federal judge for thirty years ∩nd never had the experience of preparing examinations of any kind. The ultimate issues for decision, however—the existence of discriminatory employment practices and the job-relatedness of employee selection procedures—can be determined as judges must do from the full record aided by the expert testimony produced. It must also be noted that on many occasions the figures and percentages cited in the findings of fact that support the final conclusions of law are only approximations. At times the figures reflect the fact that individuals failed to

indicate their race or national origin on application forms. Minor discrepancies also appear in some of the various reports submitted to the Court. This does not detract from the significance of those figures or percentages and is noted merely for clarification.

This has not been an easy decision. The factual findings necessitated in this area of the law are enough to boggle the minds of even the most educated of psychologists and lawyers. With that thought in mind, I must commend the attorneys on both sides for the competent manner in which this case has been presented. They have been more than diligent in their presentation and marshaling of the evidence and have been of great assistance to the Court. Their cooperation and courtesy with each other is appreciated. Their extensive and numerous proposed findings and conclusions were an invaluable source for my findings and conclusions.

In an action such as this it is hard to escape the feeling that a court will be hopelessly entangled in the formulation of social policy and professional standards outside its field of expertise. This Court, indeed, has been led deep into the "jargon of psychology." *See Vulcan Society v. Civil Service Commission*, 490 F.2d 387, 394 (2d Cir. 1973). Yet, it is hoped that I have as much as possible steered clear of resting this decision on my own preconceived notions of desirable social legislation or that of others. It is my intention that the decision herein be reached on ascertainable legal principles as applied to the particular factual situation developed by the parties. *See generally* Friendly, *The Courts and Social Policy: Substance and Procedure*, 33 U.Miami L.Rev. 21 (1978).

There is an important issue underlying this litigation that I feel I must address myself to. Even the most casual reader of this decision could not help but notice the friction and conflict between the United States Department of Justice and the United States Civil Service Commission [now replaced by the Office of Personnel Management and the Merit Systems Protection Board], *see* Reorganization Plan No. 2 of 1978, *reprinted in U.S.Code Cong. & Admin. News*, pp. 9801–9807 (1978); 43 Fed.Reg. 60984 (December 29, 1978). No one could blame the state defendants if they feel misled by the federal government because of the conflicting positions of the employees of these two federal agencies. *See generally Chaipis v. State Liquor Authority*, 44 N.Y.2d 57, 66–67, 404 N.Y.S.2d 76, 375 N.E.2d 32 (1978). Such disagreements are to be expected in our massive structure of bureaucracy. As Justice Powell observed during the oral argument of *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 2279 (1978), with regard to the burden placed upon a court under somewhat comparable circumstances:

> It is not easy to resolve issues of importance to the country when two cabinet level departments are at swords point on them.

46 U.S.L.W. 3658 (April 18, 1978).

Turning to the objectives of this action, it is important to preliminarily note that all human beings are by nature free, equal and independent. When joined in a democratic society, they place a trust in their government to act for the public good. In this case, the public good is the benefits that flow from a state police force reasonably representative of the public it serves. It is to be remembered that the more a Nation is favorable in affording equal treatment to all its members—especially through the relinquishment of past evils—the more secure will be its government and greater will be the general welfare of its people. A young, vigorous and courageous President speaking in the troubled Sixties in a stirring National Address, June 11, 1963 said:

> This Nation . . . was founded on the principle that all men were created equal, and that the rights of every man are diminished when the rights of one man are threatened. *1963 Public Papers of the President of the United States—John F. Kennedy* 468 (1964).

The evil that has long lingered in this country and against which this action has its primary thrust is the lengthy and tragic

history of our society's treatment of the Negro. This history has its unfortunate genesis in the fact that more than

> [t]hree hundred and fifty years ago, the Negro was dragged to this country in chains to be sold into slavery.

*Regents of the University of California v. Bakke,* 438 U.S. 265 at 387, 98 S.Ct. 2733 at 2798, 57 L.Ed.2d 750 (Marshall, J.). It is also to be remembered that

> [t]he experience of Negroes in America has been different in kind, not just in degree, from that of other ethnic groups. It is not merely the history of slavery alone but also that a whole people were marked as inferior by the law. And that mark has endured.

*Id.* at 400, 98 S.Ct. at 2805.

Supreme Court Justice Brennan in *United Steelworkers v. Weber,* —— U.S. ——, ——, 99 S.Ct. 2721, 2728, 61 L.Ed.2d 480 (1979), in the same vein reminded again that the statutory words of Title VII were intended by the Congress as a spur or catalyst to cause employers to examine and evaluate their employment practices and thus endeavor to eliminate, as far as possible, " ' . . . the last vestiges of an unfortunate and ignominious page in this country's history . . . .' " *See Albemarle v. Moody,* 422 U.S. 405, 417–18, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

These facts, however, should not be used to detract from the importance of securing full and equal enjoyment of the rights upon which this Nation is based for women, Spanish-surnamed Americans, and members of other minority groups. These groups likewise deserve "their turn in the sun." The trial of this case evidenced a strong desire and motivation by women to become members of this elite New York State Police force. Such attitude demonstrates that the faith of Susan B. Anthony in the female character and determination to participate and succeed in every walk of life was not unfounded.

It is therefore appropriate, although not always required, *see* 42 U.S.C. § 2000e–2(j), that special efforts be taken to correct these past inequities and injustices in our

employment patterns. *Cf. Dayton Board of Education v. Brinkman,* —— U.S. ——, —— ——, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979); *United Steelworkers v. Weber, supra,* —— U.S. ——, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); *Regents of the University of California v. Bakke, supra,* 438 U.S. at 307, 98 S.Ct. 2733 (Powell, J.). No claim is made that members of these classes of individuals lack the intelligence or courage to serve as new York State Troopers. *Cf. Foley v. Connelie,* 435 U.S. 291, 308, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978) (Stevens, J., dissenting). This is not a perfect world and employees who are fortunate enough not to have personally experienced the tragedy of belonging to a group of individuals previously kept out of the mainstream of our society should recognize the benefits associated with corrective action. Such efforts, however, must be tempered by an awareness and sensitivity to the fact that no one can honestly be asked to accept, or even understand the results of, such efforts when they come in direct conflict or interfere with their own personal ambitions. *See Regents of the University of California v. Bakke, supra,* 438 U.S. at 292–93, 294 n. 34, 295–98 & n. 37, 319 n. 53, 98 S.Ct. 2733 (Powell, J.); *id.* at 403, 98 S.Ct. 2733 (Blackmun, J.); *Shelley v. Kraemer,* 334 U.S. 1, 22, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). Care must be taken not to dull individual initiative or diversity of character.

If the words "Equal Justice Under Law" are to have meaning, they must represent a system of justice that fairly weighs the interests of all peoples. The role and place of the individual in our society must not be forgotten. Law must not be allowed to encroach upon the balanced freedom and liberty of all individuals in such a way as to stifle individuality. Everyone has a right to the free choice of employment—be that person white, Negro, Spanish-surnamed, male, or female. Yet, it must be recognized that the adding of minority workers to a work force in a society marred for years by pervasive discrimination in its employment practices is but a broadening of the field of competition for job opportunities. It is not

to be and should not be implemented in such a manner as to defeat the legitimate interests and expectations of white male workers. This would merely pile tragedy upon tragedy.

 An employer, of course, has a right to insist on hiring only qualified workers. Accordingly, insofar as it is a seller's market for educated minority and female workers, extensive and comprehensive recruitment programs are necessary. It is no excuse for a public sector employer to point to other public sector employers on the local, state, or national level and complain of equally discriminatory policies or practices, *but see* 42 U.S.C. § 2000e–16, or the absence of corrective action being taken by such employers, *but see* 48 FBI Law Enforcement Bulletin No. 7, at 6 (July 1979); 48 FBI Law Enforcement Bulletin No. 5, at 28 (May 1979); 48 FBI Law Enforcement Bulletin No. 4, at 26 (April 1979); 47 FBI Law Enforcement Bulletin No. 7, at 16 (July 1978). The federal agencies are all under affirmative action programs.

The history of our Nation has shown us that genuine equality of employment opportunity will not be obtained overnight, it must be worked on and traditional beliefs must not be used to erect barriers against the discernment of truth and the attainment of wisdom. For sure, as with most things, once the damage is done it takes time to correct. Change is costly and slow and is not without its toll of sacrifice. Justice Cardozo in his poetical style noted that the law must be ready for tomorrow. B. Cardozo, *The Nature of the Judicial Process* (1921). Hopefully, however, with the passage of time our Nation will fulfill its noble dream of truly being a melting pot for all peoples and a fully integrated society. *See generally Regents of the University of California v. Bakke, supra,* 438 U.S. at 400–402, 98 S.Ct. 2733 (Marshall, J.); *id.* at 403, 407, 98 S.Ct. 2733 (Blackmun, J.). Justice Stewart reassures with the wisdom that much has changed in twenty-five years in the Nation. Minds have changed with regard to racial relationship, and perhaps, more importantly, generations have changed.

*Columbus Board of Education v. Penick,* —— U.S. ——, ——, 99 S.Ct. 2982, 61 L.Ed.2d 666 (1979).

In the end, a cure can only come from within. The relief granted by this Court is but a temporary measure designed to advance the relinquishment of racial, ethnical, and sexual barriers in such a way as to give greater strength and stature to the principles which our Nation has chosen to adopt. The New York State Police is beyond doubt a superior police force comprised of outstanding and dedicated men and women. It is sincerely hoped that this decision will have a positive effect on the members of the New York State Police in their earnest efforts to overcome the unfair representation of minorities and women that exists presently in their ranks. In a democratic society, a police force that includes a reasonable proportion of members from the various groups of people that it serves will have a better image with the public, will better be able to carry out its law enforcement functions, and will ensure full and fair utilization of human resources without regard to color of skin, origin of birth, or gender.

I have made a great number of findings of fact, 255 in number, and conclusions of law, 36 in number. Such findings and conclusions constitute the decision in this case, and set forth in detail my analysis of the evidence and the rulings based thereon as legal conclusions. These findings, although numerous, have to be viewed and accepted as being much less than the proposed total of 971 submitted by the attorneys. The importance of detailed findings, not only at the trial level but to assist proper appellate review, was pointed up again by the recent United States Supreme Court decisions in *Columbus Board of Education v. Penick, supra,* —— U.S. ——, 99 S.Ct. 2982, 61 L.Ed.2d 666 (1979) and *Dayton Board of Education v. Brinkman,* —— U.S. ——, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979). Justice Rehnquist dissenting in *Dayton,* at ——, 99 S.Ct. at 2982, stated "That this [United States Supreme Court] and other appellate courts must defer to the factfindings of trial courts is unexceptionable."

■ I shall summarize and highlight herein the important findings and rulings that are set forth in detail in the formal and controlling findings of fact and conclusions of law. The evidence, historical, statistical, and with regard to specific acts clearly establishes a prima facie case on a theory of disparate impact in connection with plaintiff's claim of a pattern or practice of employment discrimination in hiring of Negroes, Spanish-surnamed Americans, and women. The development of the 1975 trooper examination based on a content validity strategy was not in accordance with professional standards or in compliance with federal guidelines on employee selection. A disparate impact of a selection procedure not job-related was proven by the plaintiff and not rebutted by the defendants, and justified the conclusion from statistics that the selection procedure was unlawfully discriminatory.

Less than 1% of the sworn personnel of the New York State Police were Negro, Spanish-surnamed American, or female when this action was commenced in 1977. Yet these groups of individuals comprise about 10.80%, 3.36%, and 38.60%, respectively, of the relevant labor market for entry-level position of trooper. These are startling and eye-catching statistics for a State that aspires to be in the forefront in its endeavors to correct racial employment wrongs of the past. During the course of this litigation by court order and with the willing consent of the defendants, there has been improvement in this unbalanced makeup of the force. As of November 1978, in the ranks of 3,391 sworn personnel, there are now 33 Negroes, 27 Spanish-surnamed Americans, 22 white females, and 2 black females. More minorities and females will be appointed from the list to be provided by the recent new examination.

· The past hiring practices of the ·New York State Police are in violation of Title VII of the Civil Rights Act of 1964, *as amended,* the Omnibus Crime Control and Safe Streets Act of 1968, *as amended,* the State and Local Fiscal Assistance Act of 1972, *as amended.* It is unnecessary to reach the claim based upon the Fourteenth Amendment. The assignment and promotional practices of the New York State Police were not found to be purposely discriminatory or to any extent selected and continued because of adverse impact upon Negroes, Spanish-surnamed Americans, or women.

Of the eight individual claims, three are upheld. Having been found to have suffered discrimination, Timothy K. Roberts, a Binghamton policeman, is to be offered appointment as a trooper. Trooper Lewis P. Steverson is to be offered appointment to the Bureau of Criminal Investigation (B.C.I.) of the New York State Police. John W. Herritage of the B.C.I. is to be offered a promotion to the position of Senior Investigator in the B.C.I.

■ The state defendants are enjoined from utilizing *as is* the 1975 trooper examination, including both the written and physical performance test. In the future only job-related or validated employer selection procedures are to be utilized for selection procedures. The state defendants are to continue their efforts in the development of a job-related or validated examination for the entry-level position of trooper. Such efforts should include scrutiny of all other procedures or policies entering into the selection or rejection of applicants including background investigation and need not be centered on any one particular method or validation strategy.

■ The state defendants are ordered to continue their efforts in the area of minority recruitment. Such efforts should be in the guise of an ongoing affirmative action program to attract members of the minority community.

The state defendants are ordered to include in their future appointments to the position of trooper qualified Negroes and Spanish-surnamed Americans totalling approximately 40% of each class until the total representation of such group of individuals approximately reflects their composition in the relevant labor market, which is 10.80% and 3.36% respectively.

The state defendants are ordered to include in their future appointments to trooper qualified women totalling approximately 10% of each class over the next two years. After two years, this hiring goal, its effect in remedying past discrimination as well as its effect on the New York State Police, shall be evaluated and either modified or continued in the light of actual experience.

These percentages to attain the particular hiring goals leave approximately 50% of appointments from each class open to white males and other minority groups not involved in this action.

There is no suspension, termination, or repayment of any funds heretofore made available or hereinafter to be made available to the state defendants under the Omnibus Crime Control and Safe Streets Act and the State and Local Fiscal Assistance Act.

As noted previously herein, the findings of fact and conclusions of law separately and simultaneously filed with this memorandum constitute the actual rulings and decision in the case. A final decree in accord with such rulings and the relief granted is to be submitted.