Barbra COHEN, individually and on behalf of all others similarly situated, Plaintiffs-Appellants,

v.

WEST HAVEN BOARD OF POLICE COMMISSIONERS, Louis D'Onofrio, Morton Hecht, Eugene McCarthy, Alex Botte, and Joseph Celentano, individually and in their capacity as West Haven Police Commissioners, The West Haven Police Department, Joseph Harvey, individually and in his capacity as Chief of the West Haven Police Department, and Robert Johnson, individually and in his capacity as Mayor of the City of West Haven, Connecticut, Defendants-Appellees.

No. 84, Docket 80–7233.

United States Court of Appeals, Second Circuit.

Argued Sept. 22, 1980.
Decided Dec. 23, 1980.

Joseph D. Garrison, New Haven, Conn. (Garrison, Kahn, Crane & Silbert, New Haven, Conn., on brief), for plaintiffs-appellants.

Charles H. Fischer, Jr., Asst. Corp. Counsel, City of West Haven, West Haven, Conn., for defendants-appellees.

Before KAUFMAN and KEARSE, Circuit Judges, NICKERSON, District Judge.*

1. Section 124(a) of the Act, 31 U.S.C. § 1244(a) (1976), authorizes private suits against recipients of revenue sharing funds who violate its standards. The defendants have not challenged plaintiffs' compliance with the exhaustion requirement of 31 U.S.C. § 1244(d).

KEARSE, Circuit Judge:

This is an appeal from certain portions of a final judgment entered in a class action brought by Barbra Cohen against the Board of Police Commissioners of West Haven, Connecticut, and others responsible for the hiring of police officers in West Haven (hereinafter collectively referred to as the "City"). Cohen commenced the action in the United States District Court for the District of Connecticut, alleging that a physical agility test used by the City to screen applicants for employment as supernumerary police officers discriminated against women in violation of § 122(a)(1) of the State and Local Fiscal Assistance Act, 31 U.S.C. § 1242(a)(1) (1976) (the "Revenue Sharing Act" or the "Act").[1] After a bench trial, the district court ruled that the disputed agility test was unlawful under the Act and ordered appropriate class-wide relief; no appeal was taken from that order and it is not at issue here. Plaintiff Cohen and class member Jocelyn Horwitt challenge a subsequent order of the district court, embodied in the final judgment after trial of their claims for individual relief, which denied their motion for backpay and granted in part their motion for attorneys' fees, awardable under § 124(e) of the Act, 31 U.S.C. § 1244(e).

## I. FACTS AND PRIOR PROCEEDINGS

The significant facts of this case are easily summarized. The City hires supernumerary police officers from an appointment list, on which candidates are ranked according to their performance on written and oral examinations. To receive a ranking, however, candidates must also pass a test that measures physical agility.[2] Prior to 1978 the physical agility test used by the City was the so-called "Blesh" test.[3] Al-

2. In addition, a candidate must meet certain other requirements that are not at issue here.

3. The Blesh test is named after its designer, Dr. T. Erwin Blesh, Director of Physical Education at Yale University.

though graded, the Blesh test was merely a pass-fail examination that did not alter the rankings of candidates who passed it.

Late in 1976, Cohen and Horwitt applied for positions as supernumerary police officers. Horwitt scored well enough on the written and oral examinations to rank fourth on the appointment list, and Cohen scored well enough to rank twentieth. In January 1977, the two women took the Blesh test, on which a passing score was 500. Horwitt scored 495; Cohen broke her ankle on the third of ten tests and scored 294. Having thus failed the Blesh test, both women were denied placement on the appointment list. On August 16, 1977, the City hired the man whose ranking on the list would have been immediately below that which Horwitt would have held had she passed an agility test; on September 30, 1977, the City hired a man who ranked below the position Cohen would have held.

Cohen initiated this class action in January 1978 and immediately moved for a preliminary injunction against further use of the Blesh test. After a five-day hearing on the motion, which apparently was treated as having been consolidated with a trial on the merits of certain issues, *see* Fed.R. Civ.P. 65(a)(2), the district court enjoined further use of the test. The court noted the testimony of Dr. Blesh that the test had been devised many years before, when the only applicants were men, and that very few women had ever passed; and it cited the views of both Dr. Blesh and plaintiffs' experts that many features of the test had "almost a total adverse impact upon women" applicants. 485 F.Supp. 958, 961 (D.Conn.1980). Applying standards developed under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 (1976) ("Title VII"), the court concluded that the Blesh test discriminated against

women and was not job related, and therefore violated § 122(a)(1) of the Revenue Sharing Act.[4] The City does not contest this ruling.

In light of these conclusions, the district court ordered the City to develop an agility test that was nondiscriminatory and job related. The City did so, and the court approved the new test. On August 11, 1978, Cohen and Horwitt took the new test and failed it.

Subsequently, the court entertained Cohen's and Horwitt's applications for individual relief.[5] Each plaintiff conceded that her failure of the new test rendered her currently ineligible for employment by the City, and neither sought a monetary award for any period after August 11, 1978. Cohen sought a backpay award for the period between September 30, 1977, when she claims she would have been hired but for her failure of the discriminatory Blesh test, and August 11, 1978, when she failed the new test. Horwitt sought such an award for the period between August 16, 1977, when she claims she should have been hired, and May 1978, when she took a job that she considered preferable to that of supernumerary police officer. Each plaintiff sought recovery of the difference between the compensation she would have received in the West Haven position and the compensation she received in the job she actually held during the relevant period.

In ruling on the backpay issue, the trial court noted that under Title VII, a plaintiff who has proved discrimination is presumptively entitled to backpay, and that an employer can escape liability only by showing that the plaintiff would not have been hired absent discrimination or that other special circumstances exist. 485 F.Supp. at 963, citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280

---

4. Several courts have noted that these familiar Title VII standards govern in determining liability under the Revenue Sharing Act. *See, e.g., United States v. City of Chicago*, 549 F.2d 415, 439–40 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); *Brown v. New Haven Civ. Serv. Bd.*, 474 F.Supp. 1256, 1263–64 (D.Conn.1979) (Newman, J.).

5. In essence, the trial court followed the two-stage procedure described in *United States v. United States Steel Corp.*, 520 F.2d 1043, 1052–55 (5th Cir. 1975), *cert. denied*, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976), deferring consideration of individual claims until after determination of class claims.

(1975). In the court's view, plaintiffs' inability to pass the new test "constituted conclusive proof" that they lacked the degree of physical agility the City could lawfully require, and the court concluded that the City had therefore shown that it would not have hired plaintiffs regardless of the discriminatory Blesh test. 485 F.Supp. at 964. In addition, the trial court noted that "special circumstances," described more fully below, would render an award of backpay "harsh and inequitable." *Id.* Thus plaintiffs' requests for backpay were denied.

On the motion for attorneys' fees, the trial court found that the plaintiffs were "prevailing part[ies]" within the meaning of the fee-shifting provision of § 124(e) of the Revenue Sharing Act, and had "clearly established" their entitlement to an award of fees. 485 F.Supp. at 961–62. Praising counsel's work as "exceptional," *id.* at 962, it ordered an award of $7,875.50, roughly half the amount plaintiffs had sought.

On appeal, plaintiffs contend that the trial court applied erroneous legal standards in denying backpay and abused its discretion in ordering a fee award smaller than

that requested. For the reasons set forth below, we vacate the challenged portions of the judgment and remand for further proceedings.

## II. BACKPAY

### A. *Availability of Backpay under the Revenue Sharing Act*

■ A threshold question not addressed by the parties or the district court is whether backpay is available as a remedy in private actions under the Revenue Sharing Act. In their arguments the parties have relied principally on authorities interpreting Title VII. Unlike Title VII, however, *see* 42 U.S.C. § 2000e–5(g), the Revenue Sharing Act does not explicitly provide for awards of backpay. Thus we must determine whether such an award is contemplated by the Act, and, if it is, whether Title VII standards govern.[6] We answer both questions in the affirmative.

■ The remedy section of the Revenue Sharing Act, which was added when the

---

**6.** These appear to be questions of first impression. Although several courts have noted that Title VII standards apply in determining liability for discrimination under the Revenue Sharing Act, *see* note 4 *supra*, we are aware of no decision that has relied solely upon that Act in awarding backpay to individual discriminatees. Plaintiffs who sue under the Revenue Sharing Act typically sue under Title VII as well, with the latter statute providing the basis of decision on most issues. *See, e.g., Brown v. New Haven Civ. Serv. Bd., supra* note 4; *United States v. New York,* 475 F.Supp. 1103 (N.D.N.Y.1979) (detailed findings of fact and conclusions of law reported at 21 Empl.Prac.Dec. ¶ 30,314). Here, however, the plaintiffs did not include a Title VII count in their complaint; the question of the availability of backpay under the Revenue Sharing Act is thus squarely presented.

Generally, we decline to rule on questions not presented to the trial court. *E.g., Terkildsen v. Waters,* 481 F.2d 201, 204–05 (2d Cir. 1973). On occasion, however, where questions of public importance are involved, appellate courts may *sua sponte* decide purely legal issues that are necessary to a just decision. *See Washington Gas Light Co. v. Virginia Elec. & Power Co.,* 438 F.2d 248, 250–51 (4th Cir. 1971) (dictum); *Nuelsen v. Sorensen,* 293 F.2d 454, 462 (9th Cir. 1961). *See also Singleton v. Wulff,*

428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976) (opinion of Blackmun, J., concurred in by all members of the Court on this point: "The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases."). Although *Singleton v. Wulff* held that a court of appeals had abused its discretion in reaching the merits of the case after it reversed the district court's holding that the plaintiffs lacked standing, we do not believe that decision bars us from considering the questions we raise here. At issue in *Singleton* were complex constitutional questions concerning state regulation of abortion, upon which the Supreme Court had not yet passed. By contrast, the instant litigation presents nonconstitutional questions which, despite their apparent novelty, are readily answered by reference to the language of the statute, its legislative history, and the well-elaborated scheme of federal antidiscrimination law. The importance of these questions to the administration of the Revenue Sharing Act and the relative ease of their resolution persuade us to decide them now, thus avoiding the delays of a remand and, most likely, a subsequent appeal.

Act was amended in 1976,[7] provides as follows:

> The court may grant as relief to the plaintiff [in a private suit under the Act] any temporary restraining order, preliminary or permanent injunction or other order, including the suspension, termination, or repayment of funds, or placing any further payments under this chapter in escrow pending the outcome of the litigation.

§ 124(b), 31 U.S.C. § 1244(b). Backpay is a familiar equitable remedy that is recognized as essential in alleviating the effects of employment discrimination. *See Albemarle Paper Co. v. Moody, supra.* "When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes." *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 291–92, 80 S.Ct. 332, 334–36, 4 L.Ed.2d 322 (1960) (interpreting the Fair Labor Standards Act). Since the statute empowers courts to issue "*any . . . injunction or other order*" (emphasis added) appropriate to remedy a violation of the Act, we view the language of § 124(b) itself as indicating an intention to encompass awards of backpay.

We do not read that portion of § 124(b) which permits the court to order "the suspension, termination, . . . repayment . . . or placing in escrow" of revenue sharing funds as indicating a Congressional intention to limit relief to remedies that affect an offending entity's entitlement to revenue sharing funds. To the contrary, the legislative history suggests that Congress sought to cast the remedial net as widely as possible. With respect to nearly identical language in § 122(g) of the Act concerning the Attorney General's power to enforce the antidiscrimination provisions,[8] both the Senate and Conference Reports accompanying the 1976 amendments describe the language as "expand[ing]" that authority, rather than limiting it to funds-oriented remedies. S.Rep. No. 94–1207, 94th Cong., 2d Sess. 33, *reprinted in* [1976] U.S.Code Cong. & Ad. News, pp. 5151, 5183; H.Conf.Rep.No.94–1720, 94th Cong., 2d Sess. 36, *reprinted in* [1976] U.S.Code Cong. & Ad.News, pp. 5188, 5204. The corresponding language of § 124(b) concerning private actions similarly evinces a congressional intent to permit the full array of traditional equitable remedies in addition to the other, more drastic remedies enumerated. Thus we conclude that backpay is one of the remedial tools provided by § 124(b).[9]

7. As originally enacted in 1972, the Revenue Sharing Act made no provision for suits by discriminatees, and the question of the existence of a private cause of action evidently had not arisen in the courts. Section 124 of the Act, governing private civil actions, was added to the statute when it was amended in 1976. Pub.L.No. 94–488, 90 Stat. 2349.

8. Section 122(g) provides:

> Whenever the Attorney General has reason to believe that a State government or a unit of local government has engaged or is engaging in a pattern or practice in violation of the provisions of this section [122], the Attorney General may bring a civil action in an appropriate United States district court. Such court may grant as relief any temporary restraining order, preliminary or permanent injunction, or other order, as necessary or appropriate to insure the full enjoyment of the rights described in this section, including the suspension, termination, or repayment of funds made available under subchapter I of this chapter, or placing any further payments

> under subchapter I of this chapter in escrow pending the outcome of the litigation.

31 U.S.C. § 1242(g) (1976).

> Prior to the 1976 amendments, the corresponding subsection had provided:

> When a matter is referred to the Attorney General pursuant to subsection (b) of this section, or whenever he has reason to believe that a State government or unit of local government is engaged in a pattern or practice in violation of the provisions of this section, the Attorney General may bring a civil action in any appropriate United States district court for such relief as may be appropriate, including injunctive relief.

31 U.S.C. § 1242(c) (Supp. II 1972).

9. The legislative history of the 1976 Amendments sheds little additional light on the backpay question. We note, however, that in adopting an amendment to § 122(e) permitting the Secretary of the Treasury to include, in compliance agreements with offending recipients, a requirement for restitution to discriminatees, Congress seems to have assumed that

Having concluded that backpay is a permissible remedy under the Revenue Sharing Act, we believe that standards employed under Title VII should apply in determining the propriety of such awards. Those standards are well-developed and have been used in connection with other federal anti-discrimination laws, *see Rodriguez v. Taylor*, 569 F.2d 1231 (3d Cir. 1977) (Age Discrimination in Employment Act), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978). There appears to be no reason why they should not also be applied here.

### B. *Plaintiffs' Entitlement to Backpay*

█ In Title VII class litigation, once it has been established that an employment practice is unlawful, class members victimized by the discrimination become presumptively entitled to backpay. *E.g., Albemarle Paper Co. v. Moody, supra*, 422 U.S. at 421, 95 S.Ct. at 2373; *Sledge v. J. P. Stevens & Co.*, 585 F.2d 625, 637 (4th Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979). *See also Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007 at 1015–1016 (2d Cir. 1980). Where there has been an unlawful refusal to hire, individual class members establish their prima facie entitlement to backpay simply by showing that they applied for the job and were not hired. *Sledge v. J.P. Stevens & Co., supra*, 585 F.2d at 637. *See also Rodriguez v. Taylor, supra*, 569 F.2d at 1239; *Swint v. Pullman-Standard Co.*, 539 F.2d 77, 103 (5th Cir. 1976); *EEOC v. Local 638 . . . Local 28 of the Sheet Metal Workers' Int'l Ass'n*, 532 F.2d 821, 832–33 (2d Cir. 1976). *Cf. International Brotherhood of Teamsters v. Unit-*

*ed States*, 431 U.S. 324, 361–62, 97 S.Ct. 1843, 1867–68, 52 L.Ed.2d 396 (1977). The defendant may then rebut this prima facie showing by proving that the class member would not have been hired even absent discrimination [10]—for example, because no vacancies existed or because the claimant failed to meet nondiscriminatory requirements for employment. *E.g., Sledge v. J.P. Stevens & Co., supra*, 585 F.2d at 637; *Rodriguez v. Taylor, supra*, 569 F.2d at 1240; *cf. Franks v. Bowman Transportation Co.*, 424 U.S. 747, 772–73 & n.32, 96 S.Ct. 1251, 1267–68 & n.32, 47 L.Ed.2d 444 (1976). When the defendant has attempted to prove the existence of a nondiscriminatory reason for the failure to hire but it remains uncertain whether the plaintiff would have been hired in the absence of the discriminatory practice, and the uncertainty flows from that practice, the issue should be resolved against the defendant, the party responsible for the lack of certainty. *Stewart v. General Motors Corp.*, 542 F.2d 445, 452 (7th Cir. 1976), *cert. denied*, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977); *Day v. Mathews*, 530 F.2d 1083, 1086 (D.C.Cir.1976) (per curiam). *See also Rodriguez v. Taylor, supra; United States v. United States Steel Corp.*, 520 F.2d 1043, 1050 (5th Cir. 1975), *cert. denied*, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976).

█ In denying backpay in the present case, the trial court did not adequately evaluate the City's attempt to rebut plaintiffs' prima facie case. It was undisputed that Cohen and Horwitt applied for positions with the police department, that they met

---

backpay would be available in the courts. Senator Glenn, the sponsor of the amendment, emphasized that it was intended to provide administrators responsible for enforcing the Act with the same flexible, effective remedies available in a court of equity. 122 Cong.Rec. 30322 (1976).

**10.** There is some disagreement among the Circuits concerning the magnitude of the burden an employer bears in rebutting a discriminatee's prima facie showing of entitlement to backpay. The Fourth Circuit has held that the employer need only demonstrate its nondiscriminatory reasons for refusing to hire the plaintiff by a preponderance of the evidence.

*Sledge v. J.P. Stevens Co., supra*, 585 F.2d at 637. In contrast, the Fifth Circuit and the District of Columbia Circuit have required clear and convincing evidence in order to rebut a backpay claim. *E.g., Davis v. Board of School Commissioners*, 600 F.2d 470, 474 (5th Cir. 1979), *modified on other grounds*, 616 F.2d 893 (5th Cir. 1980); *Day v. Mathews*, 530 F.2d 1083 (D.C.Cir.1976) (per curiam). Although the question apparently has not been decided in this Circuit, it is unnecessary for us to choose here between these standards, for we conclude that the evidence presented by the City failed to satisfy even the preponderance standard.

all criteria for employment except successful completion of an agility test, and that they were denied placement on the appointment list solely because they failed the discriminatory Blesh test. The court properly recognized that their prima facie entitlement to backpay had been established. The court concluded, however, that their failure of the new test in August 1978 constituted "conclusive proof that legitimate, nondiscriminatory reasons existed" for their rejection in January 1977. 485 F.Supp. at 964. We disagree.

Assuming that a defendant is allowed to show that the plaintiffs "were not in fact victims of ... discrimination," *Franks v. Bowman Transportation Co., supra,* 424 U.S. at 772, 96 S.Ct. at 1267, by offering the results of a test it has developed subsequent to the refusal to hire,[11] it is nevertheless inappropriate to allow such a justification unless the new test can reasonably be thought to measure the applicant's qualifications as of the time of the earlier refusal to hire. The reasonableness of such an inference will vary, depending principally on the nature of the qualities to be measured and the length of time between the refusal and the new test.[12] Thus although a test of general intelligence or knowledge, for example, may have retrospective validity for a substantial period of time, we have no such confidence in a test of physical agility. It is obvious that physical conditioning will have an important impact on measurable agility.[13] While one's basic physical conditioning normally varies little from week to week, there is no *a priori* reason to presume that it would remain unchanged after a period of many months.

Here, the new test was administered more than 1½ years after the discriminatory test had been failed. There was no basis for concluding, as the district court did, that plaintiffs would have failed the new test at the earlier time.

Indeed, as to Horwitt, the record suggests the contrary, even without regard to her representations that she was in substantially better physical condition at the time of the first test. On the discriminatory Blesh test, Horwitt scored 495—literally a hop, a skip, or a jump away from the passing score of 500. The new test incorporated many of the features of the Blesh test, but eliminated those features that were found to have "almost a total adverse impact upon women." Thus, if given the new test in January 1977, instead of the Blesh test, it is far more likely that Horwitt would have passed than that she would have failed. While the situation is less clear as to Cohen, any uncertainty in either case must be laid to the City.

We are compelled to conclude that the results of the August 1978 test did not constitute the requisite proof that plaintiffs were disqualified at the time the City rejected them. Since the City produced no other evidence that plaintiffs would not have been hired absent the unlawful discrimination, the City failed to rebut plaintiffs' prima facie case.

■ Nor do we agree with the trial court's conclusion that "special circumstances" precluded an award of backpay to plaintiffs. In so ruling, the district court relied on three factors: (1) what it characterized as the "windfall" nature of an award in

---

**11.** In *Franks,* the Supreme Court dealt with an attempt to rebut a Title VII plaintiff's claim for retroactive seniority, a form of "make-whole" relief comparable to backpay, and stated that the defendant must show the claimant's lack of qualification "under nondiscriminatory standards *actually applied* ... to individuals who were in fact hired." *Id.* at 773 n.32, 96 S.Ct. at 1268 n.32 (emphasis in original). It is evident that the Court intended to eliminate any rebuttal by reference to new criteria, and the phrase "standards *actually applied,*" while it would permit reference to the nondiscriminatory portions of a test actually given, may be sufficient-

ly broad to exclude a newly devised standard of measurement of a particular qualification.

**12.** We find no merit in the City's attempt to read into *Rodriguez v. Taylor, supra,* a simplistic rule that the results of later testing will suffice if they are available at the time of trial.

**13.** The Blesh test, for example, was as much a test of strength and endurance as one of agility. It required candidates to perform, within set lengths of time, such exercises as running, jumping, push-ups, sit-ups, chin-ups, and squat thrusts.

light of plaintiffs' inability to pass a nondiscriminatory agility test; (2) the absence of any need to deter future violations by the City; and (3) the City's good faith efforts to recruit women and minority group members for police work. Although backpay is an equitable remedy and, as such, lies within the trial judge's discretion, that discretion is to be exercised with a view to "'fashion[ing] . . . the most complete relief possible.'" *Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 421, 95 S.Ct. at 2373 (quoting 118 Cong.Rec. 7168 (1972) (remarks of Sen. Williams)) (brackets in original). Accordingly, once the trial court has found unlawful discrimination, "backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes" of ending employment discrimination and compensating its victims. *Id.* Measured against this standard, the factors relied upon by the district court were insufficient, either singly or in combination, to justify denying an award.

The first factor, plaintiffs' inability to pass the new test, has no significance in determining their entitlement to backpay, as we have shown above. To deny an award on this basis would encourage other employers to delay the development of valid employment tests in the hope of escaping monetary liability and would subject victims of discrimination to prolonged periods of uncertainty. *See Rodriguez v. Taylor, supra.* Such results would plainly be incompatible with the central purposes of the Revenue Sharing Act. An award of backpay would not be a windfall to the plaintiffs in these circumstances; on the contrary, under Title VII standards, denial of an award would be a windfall to the City, whose posture in this appeal is that of a proven discriminator.

The second factor, the City's willingness to comply with federal antidiscrimination laws, is comparatively unimportant in determining whether to award backpay. By focusing on the apparent lack of deterrent value in a backpay award against these defendants, the trial court overlooked the essential compensatory purposes of federal antidiscrimination laws. However extensive the City's cooperation in this suit, the fact remains that the plaintiffs have shown, prima facie, that they were injured by the City's policy, and the City has failed to counter this showing. To make whole these victims of the unlawful policy, therefore, an award of backpay was in order.

■ Finally, the trial court's third factor, the City's good faith in seeking to enhance the representativeness of its workforce, is insufficient by itself to warrant a denial of backpay. As the Supreme Court has observed with respect to Title VII, "the mere absence of bad faith simply opens the door to equity; it does not depress the scales in the employer's favor." *Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 422, 95 S.Ct. at 2373. While the trial court in this case found a demonstrably "good" faith on the employer's part, rather than the simple absence of "bad" faith, we think that the court's emphasis on the employer's aspirations and intentions accords too little weight to the legal standards that govern under Title VII. That Act focuses on effects, not purposes. *E.g., Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). To condition the availability of backpay on the subjective considerations relied upon below would undermine the twin statutory goals of eliminating the effects of discrimination and compensating its victims. Thus good faith efforts at compliance with federal antidiscrimination mandates, standing alone, will not justify a denial of backpay.

For the reasons stated above, the judgment below must be vacated and the matter remanded for computation of backpay awards to the plaintiffs.

## III. ATTORNEYS' FEES

Finally, we turn to plaintiffs' contention that the district judge abused his discretion by awarding attorneys' fees in an amount smaller than that requested. Plaintiffs' attorneys sought an award of fees totaling $16,310, representing compensation for 210 hours of work by three attorneys, at rates at or above the attorneys' normal hourly

billing rates. The trial court awarded $7,875.50 in fees. It compensated the lawyers for all the time they had spent on the case, but at hourly rates below those claimed, and at rates that differentiated among the types of services performed.[14] Plaintiffs argue that the court abused its discretion in awarding less per hour than their attorneys customarily charged and in distinguishing among the types of work performed. In addition, they contend that the court impermissibly took into account the defendants' municipal status and professed inability to pay, and the "unintentional" character of the violation. While we reject certain of these contentions, we conclude that the order must be vacated.

Although the size of an award of attorneys' fees lies largely within the discretion of the district court, e. g., *Gagne v. Maher*, 594 F.2d 336, 344 (2d Cir. 1979), aff'd, 448 U.S. ——, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980), this Circuit has established a two-step procedure to be followed in the calculation of such awards. First, the court should establish a "lodestar" figure, obtained "by multiplying the number of hours expended by each attorney involved in each type of work on the case by the hourly rate normally charged for similar work by attorneys of like skill in the area." *City of Detroit v. Grinnell Corp.* ("Grinnell II"), 560 F.2d 1093, 1098 (2d Cir. 1977). *See also City of Detroit v. Grinnell Corp.* ("Grinnell I"), 495 F.2d 448 (2d Cir. 1974).[15] Next, the court may adjust the lodestar figure upward or downward to take account of such subjective factors as the risk and complexity of the litigation and the quality of the representation. Under these procedures, a different rate of compensation may well be set for different types of litigation tasks, and an attorney whose rates are higher than those prevailing in the community may well receive less than his own usual charges.

In addition, we have held that, in setting a fee, the court may take into account the relative wealth of the parties, *Faraci v. Hickey-Freeman Co.*, 607 F.2d 1025 (2d Cir. 1979), although it is improper to reduce an award of fees on the basis of either a defendant's municipal status, *Torres v. Sachs*, 538 F.2d 10, 12–13 (2d Cir. 1976); *see also Beazer v. New York City Transit Authority*, 558 F.2d 97, 100 (2d Cir. 1977), rev'd on other grounds, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979), or the unintentional character of the violation, *see Mid-Hudson Legal Services, Inc. v. G & U, Inc.*, 578 F.2d 34 (2d Cir. 1978); *Torres v. Sachs, supra*.

Whenever the district court augments or reduces the lodestar figure, it must state its reasons for doing so " 'as specifically as possible.' " *Gagne v. Maher, supra*, 594 F.2d at 345 and *Grinnell I, supra*, 495 F.2d at 473 (quoting *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 169 (3d Cir. 1973)). In the absence of such a statement, it will be difficult, if not impossible, for the review-

---

14. Specifically, Joseph D. Garrison, plaintiffs' lead counsel, sought compensation for 185.5 hours at a premium rate of $80.00 per hour, while his co-counsel, Gerald Kahn and Jonathan Silbert, sought awards for 23 hours and 1.5 hours, respectively, at their normal billing rate of $60.00 per hour. Although Garrison's normal billing rate is $65.00 per hour, he sought a premium rate on the basis of the quality of representation and the risks of the litigation. The trial court awarded Garrison $7,018, representing 36.2 hours of trial time at $75.00 per hour, 87.8 hours of research at $35.00 per hour, and 61.5 hours of interviews and conferences at $20.00 per hour. Awards to Kahn and Silbert were computed at the rate of $35.00 per hour, the trial court's "research time" figure. Plaintiffs challenge all portions of the award save that for Garrison's trial time.

15. Although the *Grinnell* cases were antitrust class actions in which fee-shifting was permitted under the "common fund" exception to the general "American rule" requiring each side to shoulder its attorney's fees, we have followed their method of computation in civil rights cases where fee-shifting is authorized by statute. *E.g., Mid-Hudson Legal Services, Inc. v. G & U, Inc.*, 578 F.2d 34 (2d Cir. 1978) (construing 42 U.S.C. § 1988 (1976)).

Section 124(e) of the Revenue Sharing Act, 31 U.S.C. § 1244(e), mirrors other civil rights fee-shifting provisions such as 42 U.S.C. § 1988 (1976) (suits under *id.* § 1983) and *id.* § 2000e–5(k) (suits under Title VII). Accordingly, we rely on cases decided under the latter statutes in our decision in this case.

ing court to determine whether the award was within the proper exercise of the district court's discretion.

■ In the present case the district court stated as follows:

> In making awards based on the fee petitions, the factors evaluated and placed on the scales by the Court include: 1) time and labor spent; 2) counsels' experience and reputation; 3) the magnitude and complexity of the litigation; 4) the results achieved on behalf of the named plaintiff and the class she represented; 5) the quality of the advocacy; 6) the relative ability of the defendants to pay; and 7) awards in similar cases.

485 F.Supp. at 962. In addition, the court noted the "exceptional representation" provided by plaintiffs' attorneys, the City's contention that after the initial hearings it had cooperated in reaching a resolution of the controversy, and the City's "argu[ment] that because a municipality is involved and because public funds would be depleted by an award of attorneys' fees, the Court should exercise its discretion with caution and moderation." *Id.* The court concluded that, "[a]fter careful review of the arguments of counsel, the moving papers, and the controlling legal principles," an award of $7,875.50, or roughly half the amount sought, struck "a fair balance." *Id.*

The fundamental difficulty with the district court's award is that there is no indication that the court established a lodestar figure based on the prevailing rates in the legal community as required by *Grinnell II.* The purpose of the fee award is to compensate an attorney for the reasonable value of his services. The fees that would be charged for similar work by attorneys of like skill in the area should have been the starting point for determination of a rea-

sonable award. The City appears to argue that the court was familiar with the prevailing local rates and took note of them *sub silentio.* While this may be so, we do not find recognition of a lodestar figure implicit in the district court's decision.

Moreover, while the district judge listed several factors that he "evaluated and placed on the scales" and noted certain arguments of counsel, he made no statements as to which of these factors actually influenced him in setting the award as he did. The mere listing of factors " 'can never provide meaningful guidance.' " *Grinnell II, supra,* 560 F.2d at 1100, quoting *Grinnell I, supra,* 495 F.2d at 470.[16]

Finally, we note that the court described one factor as "the relative ability of the defendants to pay," citing *Faraci v. Hickey-Freeman Co., supra.* In the absence of any elaboration, it is not clear whether the court was referring to the City's wealth as compared with that of the plaintiffs, as would be permitted under *Faraci v. Hickey-Freeman Co.,* or instead referred to general considerations of impecuniosity. Ordinarily the court would not focus exclusively on the financial condition of one party unless that party appeared to be *in extremis,* which we do not understand to be true of West Haven. Given the plaintiffs' demonstrated modest means, we would be surprised if the City could show that its financial condition was relatively worse.

For the above reasons, we remand the question of attorneys' fees to the district court for a proper computation and explanation of the award. In addition, because plaintiffs are plainly the "prevailing part[ies]" on this appeal, we award them fees for their endeavors here, in an amount to be determined by the district court on remand. *See Gagne v. Maher, supra,* 594

---

**16.** Although the awards entered by the trial judge in this case strongly resemble those granted in *Firebird Soc'y v. Members of the Board of Fire Comm'rs,* 433 F.Supp. 752 (D.Conn.1976), and affirmed by us on appeal, 556 F.2d 642 (2d Cir. 1977) (per curiam), the attorneys' fees proceedings in that case "fully complied with the guidelines set forth in [*Grinnell I*]," 556 F.2d at 643. Because this is not true of the proceedings below in the instant case, we cannot simply affirm on the authority of *Firebird Society.* Moreover, the trial court could not rely exclusively upon *Firebird Society* in fixing its award. Very similar litigations may generate very different hourly rates and lodestar figures, particularly when several years of high inflation separate them.

F.2d at 344. *See also* Note, *Promoting the Vindication of Civil Rights Through the Attorney's Fees Awards Act*, 80 Colum.L.Rev. 346, 359–60 & n. 91 (1980).

Vacated and remanded for further proceedings consistent with this opinion.