Brenda **DAVIS**, et al., Plaintiffs,

v.

**CITY OF DALLAS**, Defendant.

Civ. A. No. CA 3–76–0834–F.

United States District Court, N.D. Texas, Dallas Division.

June 14, 1990.

Kenneth Molberg, Dallas, Tex., for plaintiffs.

Ana Leslie Muncy, City Atty., Craig Hopkins, Asst. City Atty., Dallas, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PORTER, District Judge.

This is a Title VII employment discrimination disparate impact case. Under the basis for liability known as the "disparate impact" theory, a facially neutral hiring practice may violate Title VII, without evidence of the employer's subjective intent to discriminate, if the hiring practice produces an adverse statistical disparate impact on a group protected under Title VII. *See Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). The Supreme Court has construed Title VII to preclude "not only overt discrimination but also practices that are fair in form but discriminatory in practice." *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).[1]

Phase I, the liability phase of this case is complete. During Phase I, class-wide liability was established against the City of Dallas and in favor of black plaintiffs who applied for police work with the City from August 1, 1973 through September 25, 1979. The City's facially neutral hiring criteria found to produce an adverse disparate impact on blacks included, for example, age, education, physical ability, criminal activity, falsification of the employment application, inability to understand English,

---

1. By contrast, to recover under the "disparate treatment" theory, a plaintiff must show that an employer has treated him less favorably than others because of his race, color, religion, sex, or national origin and that the employer acted with a discriminatory intent or motive. *See e.g., United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

poor employment history, citizenship, deviant sex, driving record, poor credit, psychological factors, and drug usage. This case is now in Phase II, the relief phase of a Title VII class action. The Court writes to address the remaining issue: damages.

## I. PRIOR DECISIONS IN THIS CASE

The Court suggests reference in chronological order to the three previously reported decisions in this case which detail the facts of the case, its procedural history, and the basis for each of the Court's prior rulings: (1) the finding of liability in favor of the class, reported as *Davis v. City of Dallas*, 483 F.Supp. 54 (N.D.Tex.1979); (2) the denial of the City's motion to reconsider the liability finding, reported as *Davis v. City of Dallas*, 487 F.Supp. 389 (N.D.Tex. 1980); and (3) the Fifth Circuit's affirmance of this Court's finding of the job-relatedness of certain challenged hiring criteria, reported as *Davis v. City of Dallas*, 777 F.2d 205 (5th Cir.1985), *cert. denied* 476 U.S. 1116, 106 S.Ct. 1972, 90 L.Ed.2d 656 (1986).[2]

## II. SUMMARY OF THE FACTS

Cynthia Jane Durbin, a white female, applied for a position as a City of Dallas police officer. The City hired Durbin, but later discharged her because of unsatisfactory performance during field training. Durbin alleged that the City discharged her because she is female. Brenda Davis also applied for a position as a City of Dallas police officer. The City rejected Davis's employment application on the ground that it had been falsified. Davis alleged that the City rejected her application because she is black.

Durbin and Davis each sued the City of Dallas alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Title VII forbids an employer to "fail or refuse to hire or to discharge any individual ... because of such individual's race, color, religion, sex or national origin." In

passing Title VII, Congress announced that sex, race, religion, and national origin are irrelevant to the selection, evaluation, and compensation of employees. 42 U.S.C. sec. 2000e–2(a)(1) and (2). Yet, "the statute does not purport to limit the other qualities and characteristics that employers *may* take into account in making employment decisions." *Price Waterhouse v. Hopkins*, 490 U.S. 228, ——, 109 S.Ct. 1775, 1784, 104 L.Ed.2d 268, 280 (1989) (emphasis in original).

In July of 1978, the Court certified the *Durbin* case and the *Davis* case as class actions and later consolidated the two cases for trial. Durbin and Davis served as representatives of the class of all female and black applicants who had been denied permanent employment as City of Dallas police officers. In the trial of the liability portion of this case to the bench in September of 1979, Judge Patrick Higginbotham held that although "the City [of Dallas] was acting in good faith," its selection process had an adverse statistical disparate impact on black applicants—but not on female applicants—which was not negated by the City's special affirmative efforts to recruit blacks. *Davis v. City of Dallas*, 483 F.Supp. at 58–59.

In March of 1980, the Court denied the City's motion to reconsider the liability finding. *Davis v. City of Dallas*, 487 F.Supp. 389 (N.D.Tex.1980). Since the plaintiffs' complaint requested injunctive relief barring the City from using discriminatory selection criteria in hiring future police officers, the Court directed the plaintiffs to brief the issue and to submit a proposed injunction. The Court stated that "the plaintiffs are entitled to an injunction against the use of those criteria which have a racially disparate impact and are not shown by the City, through competent evidence, to have a significant and demonstrable relationship to performance as a police officer." *Id.* at 395.

The plaintiffs applied for injunctive relief in June of 1981. After the liability finding

---

**2.** The court's underlying memorandum opinion and order denying injunctive relief is unpublished. *See Davis v. City of Dallas, Memoran-* *dum Opinion and Order,* CA3–76–0834–F (Porter, J., August 24, 1984).

against the City, but before a hearing on the plaintiffs' requested injunction, the City of Dallas Police Department modified or eliminated approximately fifty of the hiring criteria challenged in the injunction as racially discriminatory, to the mutual satisfaction of the parties. The parties reached agreement on all of the challenged criteria except three.

This Court held an evidentiary hearing on plaintiffs' request for an injunction, at which hearing the issue presented was whether the three disputed hiring criteria (college credit, marijuana usage and traffic violation convictions) were job-related and therefore valid, despite an adverse disparate impact on blacks. Applying *Griggs v. Duke Power Co.*,[3] 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Court held that all three of the challenged criteria were job-related and, accordingly, denied injunctive relief to the plaintiffs on August 24, 1984. The three criteria challenged at the injunction hearing are known as the "subsequently validated criteria."[4]

At the injunction hearing, the plaintiffs had an opportunity to rebut the City's showing of the job-relatedness of each of the challenged criteria. The plaintiffs could rebut the defendant's showing by establishing either that (1) the hiring criteria were not, in fact, job-related; or (2) that alternatives to the hiring criteria were available for use by the City that would not produce an adverse disparate impact on blacks.

Plaintiffs argued that no relationship existed between the challenged criteria and an applicant's later job performance as a police officer. The challenged criteria, plaintiffs argued, were in reality an arbitrary screening procedure designed to exclude black applicants. The Court rejected this argument. At the injunction hearing, plaintiffs presented evidence, but failed to persuade the court, that "sufficient credible alternatives" to the challenged criteria exist which would fulfill the City's legitimate hiring interests without producing an undesirable disparate impact on blacks.

## III. ISSUES RAISED BY THE PARTIES

After a finding of liability in Phase I, a disparate impact class action discrimination case proceeds to Phase II for a determination of the appropriate relief. The parties have filed briefs addressing the issue of damages in this case. In their briefs to the court concerning damages, the parties raise the following issues:

(1) Does a finding of liability to a class of plaintiffs in a Title VII disparate impact case raise a rebuttable presumption of entitlement to relief for each member of the class?

(2) If so, what evidence is admissible to rebut claims for relief? Specifically,

---

3. In *Griggs*, the employer had a history of overt racial discrimination that predated the enactment of the Civil Rights Act of 1964. 401 U.S. at 426–28, 91 S.Ct. at 851–52. Although the employer's overt racial discrimination apparently ceased after the enactment of the Civil Rights Act, it continued to follow employment policies that had "a markedly disproportionate" adverse effect on blacks. *Id.* at 428–29, 91 S.Ct. at 852–53. The Court in *Griggs* found that certain hiring criteria involving the use of general aptitude tests and a high school diploma requirement were not demonstrably job-related and concluded that use of such hiring criteria could not be defended simply on the basis of their facial neutrality or on the basis of the employer's lack of discriminatory intent. 401 U.S. at 431–32, 91 S.Ct. at 853–54. *See also Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988).

However, the Court in *Griggs* recognized that Congress did not intend by Title VII "to guarantee a job to every person regardless of qualifica-

tions," but, rather, to remove "artificial, arbitrary, and unnecessary barriers to employment when the barriers operate ... to discriminate on the basis of racial or other impermissible classifications." *Griggs*, 91 S.Ct. at 853–54.

4. The criteria are described as subsequently validated because subsequent to the liability finding, each criterion was judicially determined to be valid in the sense that it was found to legitimately indicate that an applicant possessed a certain skill essential to perform police work. Further, each challenged criterion was shown by the City to have a significant and demonstrable relationship to an applicant's future performance as a police officer and is therefore also described as job-related. Pursuant to *Griggs, supra*, an employer may use a hiring criterion shown to be job-related even if use of that criterion produces an adverse disparate impact on a group protected under Title VII.

may the City introduce evidence that a particular class member failed to meet the three subsequently validated hiring criteria?

(3) Finally, should relief to which each class member is found to be entitled be determined on a class-wide or individual basis?

The court addresses each issue in turn, setting forth the applicable evidentiary burdens to be borne by each party and outlining the evidence admissible to meet these evidentiary burdens.

## IV. DOES A FINDING OF CLASS-WIDE LIABILITY CREATE A REBUTTABLE PRESUMPTION OF ENTITLEMENT TO RELIEF FOR EACH CLASS MEMBER?

■ Yes. Once liability has been determined, as in this case, a presumption of entitlement to relief arises. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). This presumption is justified by both the deterrent and "make-whole" purposes at the core of Title VII. *Albemarle*, 422 U.S. at 422, 95 S.Ct. at 2374. However, the presumption of entitlement may be rebutted. Title VII does not contemplate automatic compensation for a person simply because he is a member of the class; a finding of class-wide disparate impact does not *per se* entitle a class member to back pay without individual clarification. *See Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 257, 259 (5th Cir.1974), *reh'g denied*, 581 F.2d 267, *cert. denied* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74. Rather, in a class action, a finding of class-wide liability creates a rebuttable presumption that any particular employment decision made by the defendant during the relevant period was made pursuant to a discriminatory policy or practice. *See e.g., International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

Judge Higginbotham recognized the creation of a rebuttable presumption in his order of December 28, 1979, as follows: "[T]he primary effect of the finding of class liability is to place the burden on the City of showing on a case-by-case basis that an applicant was rejected for reasons other than race, such as failure to meet a valid job requirement." Order, No. CA3-76-0834-G, December 28, 1979 at 1. (Higginbotham, J., unpublished). "Those qualifications proven to be valid measures of police officer performance may be used whether they exclude blacks, females, hispanics, or white males." *Id.* at 3.

## V. THE BURDEN OF PROOF: THE DEFENDANT'S BURDEN OF PRODUCTION AS DISTINGUISHED FROM THE PLAINTIFFS' BURDEN OF PERSUASION

■ In *Wards Cove Packing Co. v. Atonio, supra*, the Supreme Court clarified that although some of its earlier decisions can be read to suggest otherwise, those cases speaking of "an employers' 'burden of proof' with respect to a legitimate business justification defense, see, e.g. *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977), should have been understood to mean an employer's production—not persuasion—burden." *Wards Cove*, 490 U.S. at ——, 109 S.Ct. at 2126, 104 L.Ed.2d at 753. The burden of persuasion "must remain with the plaintiff, for it is he who must prove that it was 'because of such individual's race, color,' etc. that he was denied a desired employment opportunity." *Ward's Cove* at ——, 109 S.Ct. at 2126, 104 L.Ed.2d at 753 (quoting 42 U.S.C. sec. 2000e-2(a)).

Perhaps the most frequently cited Supreme Court case addressing the nature of the evidentiary burdens placed upon a defendant in an employment discrimination lawsuit brought under Title VII is *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In *Burdine*, the Supreme Court held that after a plaintiff in an employment discrimination suit proves a prima facie case of disparate impact or disparate treatment, the burden shifts to the defendant to produce a clear explanation of a nondiscriminatory reason for its actions. The defendant, the Supreme Court held, need not prove that the individ-

ual selected was better qualified than the plaintiff. In *Burdine,* the Supreme Court stated that the ultimate burden of proving discrimination always remains with the plaintiff.

The burden of proof set forth in *Burdine* has been consistently upheld by the Supreme Court. *See e.g. Wards Cove Packing Co. v. Atonio, supra; Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). First, the plaintiff must make a prima facie showing that a specific employment practice has a disparate impact on a protected class to which the plaintiff belongs. *See Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093, 67 L.Ed.2d at 215. In this case, the plaintiffs have made such a prima facie showing of the adverse disparate impact produced on blacks by the City's hiring criteria; liability in favor of the class has been established. Upon such a prima facie showing of adverse disparate impact, the burden shifts to the defendant employer to "produce evidence, but not to prove, that the 'challenged practice serves, in a significant way, the legitimate employment goals of the employer.'" *Bernard v. Gulf Oil Corp.,* 890 F.2d 735, 740 (5th Cir.1989), (quoting *Wards Cove,* 109 S.Ct. at 2126).

Applying this standard of proof, the City of Dallas currently bears the burden of producing a clear, reasonably specific, legitimate, nondiscriminatory reason for each of its challenged hiring decisions. To rebut the presumption of discrimination established by a plaintiff who has made out a prima facie case of adverse disparate impact,

"the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation given must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on

the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Burdine,* 450 U.S. at 254–56, 101 S.Ct. at 1094–95, 67 L.Ed.2d at 216–17.

As the Supreme Court clarified in *Wards Cove,* while "a mere insubstantial justification ... will not suffice[,] there is no requirement that the challenged practice be essential for it to pass muster." *Wards Cove,* 109 S.Ct. at 2126. After the defendant employer produces legitimate, nondiscriminatory reasons for failing to hire a plaintiff, a plaintiff may nonetheless prevail if she establishes, by a preponderance of the evidence, that the reasons produced by the employer for refusing to offer employment were in reality a pretext for racial discrimination. *Wards Cove,* 490 U.S. at ——, 109 S.Ct. at 2126, 104 L.Ed.2d at 753.

If, for example, the employer produces evidence that its hiring criteria are a business necessity, or are job related, then "it remains open to the complaining party to show that other tests or selection devises, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in 'efficient and trustworthy workmanship'" *Bernard,* 890 F.2d at 742 (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 1823–24, 36 L.Ed.2d 668 (1973)). By demonstrating that other credible hiring tests exist which would also fulfill the employer's legitimate hiring interests, the plaintiff prevails in her effort to prove that the employer used the challenged hiring tests as a pretext for racial discrimination. The ultimate burden of persuasion that discrimination has occurred thus remains with the disparate-impact plaintiff at all times. *Wards Cove Packing Co. v. Atonio,* 490 U.S. at ——, 109 S.Ct. at 2126, 104 L.Ed.2d at 753.[5]

5. The Supreme Court has commented that "this rule [regarding the burden of persuasion] conforms with the usual method for allocating per-

suasion and production burdens in the federal courts [see Fed. Rule Evid. 301] and more specifically, it conforms to the rule in disparate-

## VI. THE ADMISSIBILITY OF EVIDENCE REGARDING THE SUBSEQUENTLY VALIDATED CRITERIA

Given that the Supreme Court's decisions in *Burdine, Watson,* and most recently in *Wards Cove* allow the City to produce evidence in rebuttal of individual damage claims, the question arises as to whether evidence of a claimant's failure to qualify for employment under the three subsequently validated criteria is admissible. Pursuant to Federal Rules of Evidence 402 and 403, all relevant evidence shall be admitted in a case, unless its probative value is substantially outweighed by the danger of unfair prejudice, the confusion of the issues, the misleading of the jury, or the undue delay of the disposition of the case. Evidence is relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." Rule 401.

■ Plaintiffs essentially contend that evidence regarding the subsequently validated hiring criteria is irrelevant to the determination of relief and is inadmissible under the Federal Rules because the subsequently validated hiring criteria were not the original criteria used by the City to reject employment applications by class members. The City applied different criteria, known as the "actually applied" criteria, to reject employment applications by members of the class. Plaintiffs assert that the subsequently validated criteria differ substantially from the actually applied criteria. The Court construes the plaintiffs' argument to be that only the actually applied criteria, not the subsequently validated criteria, can accurately measure a plaintiff's qualifications at the time that he was denied employment.

The City, on the other hand, contends that evidence of the subsequently validated criteria is admissible, asserting that the subsequently validated hiring criteria and the actually applied criteria are substantially the same. At the injunction hearing, the subsequently validated criteria were upheld as job-related and valid, despite an adverse disparate impact on blacks. If the subsequently validated criteria are substantially the same as the actually applied criteria, then the actually applied criteria were also job-related at the time that the City used them to refuse employment to members of the class. If members of the class were rejected because they failed to meet a job-related requirement, then, the City's argument goes, no compensable discrimination occurred because under *Griggs, supra,* job-related hiring criteria are valid despite an adverse disparate impact on a protected class. The City concludes that those class members failing to qualify for police work under the three subsequently validated hiring criteria were not discriminated against in violation of Title VII and therefore need not be made whole by hiring or back pay.

The Court frames the issue presented by the unique set of facts in this case as follows: Where (1) an employer is found to be liable to a class of plaintiffs (2) due to the discriminatory disparate impact of its hiring criteria (3) after which finding of liability the parties modify or eliminate all but three of the hiring criteria (4) and negotiate and modify but nevertheless litigate the three remaining disputed criteria (5) which disputed criteria are later found to be job-related: May an employer meet its burden of producing a legitimate, nondiscriminatory reason for refusing to hire a plaintiff, by referring to the three subsequently validated hiring criteria?

Plaintiffs cite *Franks v. Bowman Transportation Co.,* 424 U.S. 747 n. 32, 96 S.Ct. 1251 n. 32, 47 L.Ed.2d 444 n. 32 (1976) in support of their contention that once the burden of production shifts to the defendant to produce evidence of a business justification for his employment practice, the defendant may not establish by reference to criteria validated after the liability phase that members of the plaintiff class were unqualified for work, at the time that each was refused employment, and there-

treatment cases that the plaintiff bears the burden of disproving an employer's assertion that the adverse employment action was based solely on legitimate neutral consideration." *Wards Cove Packing Co. v. Atonio,* 490 U.S. at ——, 109 S.Ct. at 2126, 104 L.Ed.2d at 753.

fore they suffered no discrimination by the City's refusal to hire. *Franks*, however, does not support the plaintiffs' contention.

In *Franks*, a Title VII racial discrimination suit, a class of truck driver applicants sought hiring, back pay, and a retroactive award of seniority. The only named class representative had been hired, however, given back pay, and then later discharged for cause. As to the sole issue of retroactive seniority that was before the Supreme Court, the class representative's claim was moot since he no longer had his job. The Supreme Court nonetheless found an Article III case or controversy between the defendant employer and the certified class. The issue before the Supreme Court in *Franks* was mootness, which is not in issue before this court.

In addition to *Franks*, plaintiffs cite *Cohen v. West Haven Board of Police Commissioners*, 638 F.2d 496 (2d Cir.1980), in support of their contention that evidence regarding subsequently validated hiring procedures is inadmissible to disqualify members of the class. Plaintiffs' reliance on *Cohen* is misplaced. The *Cohen* decision does not completely preclude the use of subsequent tests to disqualify members of a plaintiff class. Rather, the Court in *Cohen* stated that a new test may be used if it "can reasonably be thought to measure the applicant's qualifications as of the time of the earlier refusal to hire." In note 11 of *Cohen*, the Second Circuit refers to the Supreme Court's "actually applied" language as used in note 32 of the *Franks* decision, but declines to define its limits.[6] No other case law addresses the use of evidence of hiring criteria modified and validated after a finding of liability, to dis-

qualify members of a plaintiff class, and thus the question is left to this court.[7]

To determine admissibility, the court compares the actually applied hiring criteria with the subsequently validated hiring criteria and applies the *Cohen* test. If the subsequently validated criteria are similar in key aspects to the actually applied criteria, then the subsequently validated criteria can reasonably be thought to measure the applicant's qualifications at the time that the applicant applied for the job, and therefore may be used in rebuttal of a plaintiff's damage claim.

## VII. COMPARISON OF THE ACTUALLY APPLIED AND SUBSEQUENTLY VALIDATED CRITERIA

### 1. *Marijuana Usage*

The hiring criterion regarding marijuana usage actually used to reject members of the class states that: "the applicant must not have recent marijuana usage as determined by the Marijuana Usage Chart." (Exhibits B and C of Response of Plaintiffs and the Class to the Court's Order of July 18, 1988. See *Davis v. City of Dallas*, 777 F.2d at 223 n. 18 for discussion). Under the Marijuana Usage Chart, disqualification is determined by the number of separate occasions on which the applicant has used marijuana within various time periods preceding his application for employment. More occasions of use are permissible if over greater lengths of time. For example, any marijuana use within three months immediately preceding the application is disqualifying, but as many as thirty-five separate occasions of

---

**6.** Footnote 11 reads as follows: "In *Franks*, the Supreme Court dealt with an attempt to rebut a Title VII plaintiff's claim for retroactive seniority, a form of 'make-whole' relief comparable to back pay, and stated that the defendant must show the claimant's lack of qualification 'under discriminatory standards *actually applied* ... to individuals who were in fact hired.' *Id.* at 773 n. 32, 96 S.Ct. at 1268 n. 32. It is evident that the court intended to eliminate any rebuttal by reference to the new criteria, and the phrase 'standards actually applied,' while it would permit reference to the nondiscriminatory portions of a test actually given, may be sufficiently

broad to exclude a newly devised standard of measurement of a particular qualification." *Cohen*, 638 F.2d at 503 n. 11 (Emphasis in original).

**7.** Although *Rodriguez v. Taylor*, 569 F.2d 1231, 1239, n. 20 (3rd Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978), and *Muntin v. State of Cal. Parks & Recreation Dept.*, 738 F.2d 1054, 1056 (9th Cir.1984) mention the *Franks* "actually applied" standard, neither case involves employment criteria which were subsequently modified, and found to be job-related, as in this case.

use within the preceding two years are not necessarily disqualifying.

The hiring criterion subsequently validated as job-related states that "the applicant will be disqualified [for] marijuana usage under circumstances determined by the marijuana usage chart. The applicant must not have possessed more than four ounces of marijuana at one time or have ever sold or delivered marijuana." Memorandum Opinion and Order No. CA3–76–0834–F, August 24, 1984, (Porter, J., unpublished) (hereinafter "Order of August 24, 1984"); *Davis v. City of Dallas*, 777 F.2d at 223–25.

The Court finds no substantial difference between the actually applied and the subsequently validated criterion. The marijuana usage chart stayed the same. The language regarding possession of marijuana, which was added, is based on TEX.REV. CIV.STAT.ANN. art. 4476–15 § 4.051(a), now codified as section 481.121 of The Texas Health and Safety Code (Vernon 1990), which provides that possession of marijuana in the amount of more than four ounces, but five pounds or less, is a third-degree felony. *See* V.T.C.A. Penal Code, sec. 12.-34.

In upholding this Court's finding that the hiring criterion regarding marijuana usage is job-related to the duties of a City of Dallas police officer, within the meaning of *Griggs*, the Fifth Circuit reviewed this Court's finding in light of the Tenth Circuit's decision in *Spurlock v. United Airlines, Inc.*, 475 F.2d 216 (10th Cir.1972). By adopting the *Spurlock* analysis regarding job-relatedness, the Fifth Circuit joined six other federal appellate courts which have also applied the *Spurlock* analysis in determining whether certain hiring criteria were sufficiently related to certain jobs that greatly implicate human safety.[8]

At the injunction hearing, the City's experts testified that recent or excessive marijuana use has a negative effect on a police officer's job performance in at least three different ways: (1) lack of willingness to enforce marijuana laws; (2) tendency to continue the use of the drug, thereby continuing to break the law; and (3) the creation of a negative public perception—including that of a juror—of police as marijuana users. This Court wrote that "enforcement of the laws and obedience of the law, and public respect and trust in the officer, including [his] credibility as a witness are essential characteristics of a police officer." Order of August 24, 1984 at 9–10. The City thus established at the hearing that the challenged practice of rejecting applicants for recent or excessive marijuana use serves, in a significant way, the legitimate employment goals of the employer.

### 2. College Education

The hiring criterion regarding education used to reject members of the class provided the following:

> "[The applicant] [m]ust have at least forty-five (45) semester hours college credit with a "C" average (2.00 grade average on four point system) or better from an accredited college or university."[9]

---

**8.** In affirming this court's job-relatedness findings, the Fifth Circuit quoted the following explanation as set forth in the *Spurlock* decision:

> When a job requires a small amount of skill and training and the consequences of hiring an unqualified applicant are insignificant, the courts should examine closely any pre-employment standard or criteria which discriminate against minorities. In such a case, the employer should have a heavy burden to demonstrate to the lower court's satisfaction that his employment criteria are job-related. On the other hand, when the job clearly requires a high degree of skill and the economic and human risks involved in hiring an unqualified applicant are great, the employer bears a corresponding lighter burden to show that his

employment criteria are job related.... The courts, therefore, should proceed with great caution before requiring an employer to lower his pre-employment standards for such a job. *Davis v. City of Dallas*, 777 F.2d at 213.

**9.** The previous criterion also specified the following course work to be unacceptable: (a) below college level courses; (b) courses from non-accredited colleges or universities; (c) more than four (4) semester hours credit in physical education activity courses from a two year college or from a four year college when the applicant is not a physical education major or does not hold a bachelor's degree; (d) below "C" level course work; however, if the applicant has a grade point average of below 2.00, and it is possible to selectively compute his grade

The subsequently validated hiring criterion stated that the "applicant must have at least 45 semester hours of college credit with a 'C' average (2.00 grade average on four point system) or better from an accredited college or university." See *Davis v. City of Dallas*, 777 F.2d at 215–23 for discussion. Plaintiffs urge that the criterion actually used to reject members of the class is more stringent than the criterion subsequently validated. Essentially, plaintiffs wish to point out that if the subsequently validated hiring criterion is used to disqualify members of the class, fewer plaintiffs will be eligible for relief than if the actually applied criterion is used. The number of plaintiffs who will recover under a given criterion is not the focus of the Court's inquiry, however. The Court focuses on whether the actually applied and subsequently validated criteria are similar in key respects.

The number of required hours and the required grade point average stayed the same. Items (a), (b), (c), (e) and (f) of the previous criterion simply assure that the applicant's college credit had some substantive intellectual value. Item (d) of the previous criterion largely restates the subsequently validated criterion, except that it provides some leeway for applicants who have some poor grades. While some difference may exist, the Court finds that such a difference is not substantial.

At the injunction hearing, the City's experts established the relationship between college education and the job performance of police officers. This Court wrote:

> Because of the responsibility given to an officer through his gun and badge, society must prepare the officer for his or her responsibility as fully as possible. College requirements are one of the tools for preparation.

> A policeman today is poorly equipped for his job if he does not understand the legal issues involved in his everyday work, the nature of the societal problems he constantly encounters, [and] the psychology of those people whose attitudes towards the law differ from his. Such understanding is not easy to acquire without the kind of broad general knowledge that a higher education imparts, and without such understanding a policeman's response to many of the situations he meets is likely to be impulsive or doctrinaire.

> Few professionals are so peculiarly charged with individual responsibility as police officers. Officers are compelled to make instantaneous decisions, often without clear cut guidance from the Legislature or departmental policy, and mistakes of judgment could cause irreparable harm to citizens or even to the community. Complexities inherent in the policing function dictate that officers possess a high degree of intelligence, education, tact, sound judgment, impartiality and honesty. Order of August 24, 1984 at 5–6.

Based on the evidence presented at the injunction hearing, this court found (1) that the college education requirement is a "business necessity"; and (2) that the plaintiffs failed to sufficiently show that other alternatives exist which would serve the City's legitimate interest in selecting qualified applicants to be police officers, without producing a disparate impact on black applicants.

### 3. *Driving Record*

The previous hiring criterion excluded those applicants who had three (3) or more hazardous traffic convictions or who were at fault in three (3) or more motor vehicle accidents, or who had any combination of four (4) or more of the above in the past twelve months. (Exhibit E of Response of Plaintiffs and the Class to the Court's Order of July 18, 1988).

The subsequently validated hiring criterion stated that the applicant must not have had three or more hazardous traffic convic-

point average, and his overall average is 2.00 or better, this is permissible; (e) "give away" courses (for example, courses where credit is allowed for work experience); and (f) technical training, business schools, two year non-degree courses of study, unless accepted by an accredited junior college, community college, college or university. (Exhibit D of Response of Plaintiffs and the Class to the Court's Order of July 18, 1988).

tions during the past 12 months and that the applicant must not have had 6 or more hazardous traffic convictions during the last 24 months. Order of August 24, 1984 at 10; See *Davis v. City of Dallas,* 777 F.2d at 225–26 for discussion. Again, the Court finds substantial similarity between the subsequently validated hiring criterion and the actually applied criterion.

At the injunction hearing, the defendant's expert witness, a casualty actuary, testified that there is a high, positive correlation between past motor vehicle collisions and the probability of future collisions. While each study cited by the expert showed that future collisions cannot be totally predicted, the studies isolated an individual's driving record as one of the most significant and accurate predictors of the likelihood of future collisions. This Court found that an officer's "ability to drive safely is an essential part of [his] duties" because new officers are assigned to the patrol division for at least two years at the beginning of their careers and those officers later assigned to desk jobs also serve on patrol squads in times of emergency. Order of August 24, 1984 at 10.

Because the subsequently validated hiring criteria are substantially the same as the criteria used to reject members of the class, the Court concludes that they can reasonably be thought to measure the applicant's qualifications at the time of the refusal to hire and therefore meet the *Cohen* test. The Court holds that reference to the subsequently validated criteria is competent, admissible evidence in this case. Whether a particular plaintiff actually failed to meet one of the subsequently validated criteria at the time of his employment application is a question for the factfinder.

## VIII. PLAINTIFFS' FAILURE TO SUSTAIN THE BURDEN OF PERSUASION: CONCLUSION OF THE LITIGATION WITH REGARD TO THOSE PLAINTIFFS WHO ARE SHOWN TO BE DISQUALIFIED UNDER THE SUBSEQUENTLY VALIDATED CRITERIA

At the conclusion of the injunction hearing, this court entered findings as follows:

"[D]efendant has sufficiently shown the job-relatedness or business necessity of each of their challenged selection criteria. Plaintiff has failed to show sufficient credible alternatives for these criteria. Consequently, all injunctive relief requested by plaintiff is denied." Order of August 24, 1984 at 11.

The finding of plaintiffs' failure to show sufficient credible alternatives to the three hiring criteria challenged at the injunction hearing is significant. This finding concludes the litigation with regard to those plaintiffs who do not qualify for employment under the three subsequently validated hiring criteria. With regard to the category of claims involving the subsequently validated hiring criteria, this case has proceeded through each evidentiary stage required in a Title VII discrimination disparate impact case. The result is that those plaintiffs failing to qualify for employment under any of the three subsequently validated hiring criteria have failed to sustain their ultimate burden of persuasion that the City racially discriminated in denying them employment.

With regard to the category of claims involving reference to the subsequently validated hiring criteria, this litigation has properly proceeded through the required stages as follows:

First, the plaintiffs established a prime facie case of racial disparate impact concerning the City's facially neutral hiring criteria.

Second, the City rebutted the presumption of liability created by the plaintiffs' prima facie showing by producing evidence that three of the hiring criteria, found in this order to be substantially the same as the criteria actually applied to originally reject members of the class, were sufficiently job-related within the meaning of *Griggs.*

Third, consistent with the Supreme Court's holding in *Wards Cove,* plaintiffs had the opportunity at the injunction hearing to show that alternative selection methods would also serve the City's hiring inter-

ests, without producing an undesirable disparate impact on blacks. Plaintiffs introduced evidence, but failed to show "sufficient credible alternatives" to the challenged criteria. Plaintiffs failed to sustain their burden of persuasion. The defendant shall therefore prevail on any claim asserted by a class member who is shown to be disqualified under any of the three subsequently validated hiring criteria.

## IX. FASHIONING A REMEDY

■ The City argues that in fashioning a remedy, the Court should look to all the facts and circumstances and weigh public policy and motive against actual injury. Essentially, the City advocates a case-by-case, individual determination of damages. Plaintiffs, however, contend that a class determination of damages is appropriate. What justification they rely upon to support this contention is not clear, since plaintiffs' brief on this point simply attacks the City's position.

■ The framing of a remedial decree is within the discretionary authority of the trial judge. Where racial discrimination is concerned, a "district court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The Supreme Court has recognized that the public interest is an important factor to be considered in fashioning Title VII relief: "In devising and implementing remedies under Title VII ..., a court must draw on the 'qualities of mercy and practicality [that] have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.'" *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 375, 97 S.Ct. 1843, 1875, 52 L.Ed.2d 396 (1977), (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30, 64 S.Ct. 587, 591–92, 88 L.Ed. 754 (1944)).

The language of Title VII, 42 U.S.C. sec. 2000e–5(g), guides this court in fashioning a remedy. This section provides that:

[t]he court may ... order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.

In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 361, 97 S.Ct. 1843, 1868, 52 L.Ed.2d 396 (1977), the Supreme Court stated that when plaintiffs seek relief as "victims of the discriminatory practice, a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief." Back pay awards on an individual basis to particular employees should be used when possible because such a procedure will best compensate the victims of discrimination without unfairly penalizing the employer. *See United States v. United States Steel Corp.*, 520 F.2d 1043, 1055 (5th Cir.1977). In determining damages to a class, "alternative methods possessed of superior certainty should be exhausted before the court resorts to racially-drawn classwide comparisons." *United States v. United States Steel Corp.*, 520 F.2d at 1055, 1056.

Although these decisions appear to raise a presumption in favor of individualized hearings, courts have not interpreted them to require individual hearings at all times. For example, hearings have not been required "when discrimination has so percolated through an employment system that any attempt to reconstruct individual employment histories would drag the court into a 'quagmire of hypothetical judgments.'" *Hameed v. International Ass'n of Ironworkers*, 637 F.2d 506, 520 (8th Cir. 1980); *Stewart v. General Motors Corp.*, 542 F.2d 445, 452–53 (7th Cir.1976), *cert. denied*, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977).

**1178**

The Court is of the opinion that in this case individual employment histories can be reconstructed without dragging the court into a "quagmire of hypothetical judgments" and also without imposing undue hardship on either party. For example, the following factors exist:

(1) the class size is manageable, approximately 275 members;

(2) the time period within which discrimination occurred is definable: August 1, 1973—September 25, 1979;

(3) only one type of job is involved, that of a City of Dallas police officer;

(4) the three disputed hiring criteria have been litigated and found to be job-related and evidence regarding these job-related criteria (the subsequently validated hiring criteria concerning marijuana usage, college credit and traffic violation convictions) has been held in this order to be admissable.

### X. THE DEFINITION OF BACK PAY

In anticipation of any disagreement with regard to the proper calculation of back pay, the Court refers the parties to 42 U.S.C. § 2000e–5(g) which provides that, "back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable."

■ The remedial purposes of Title VII mandate back pay relief in all but "special" circumstances. *Carpenter v. Stephen F. Austin State University,* 706 F.2d 608 (5th Cir.1983). Difficulty in calculating the precise amount of back pay does not defeat an injured plaintiff's right to back pay in a Title VII action. *Salinas v. Roadway Exp., Inc.,* 735 F.2d 1574 (5th Cir.1984). Because retroactive relief places the victim in the position that he would have occupied but for the discrimination, back pay includes not only salary loss, but also compensation for lost overtime, shift differen-

tial, and fringe benefits (e.g., sick pay, annual leave, and vacation pay). *Willett v. Emory & Henry College* 569 F.2d 212 (4th Cir.1978).

■ An employer who has discriminated in its hiring practices can toll the accrual of back pay liability by unconditionally offering the plaintiff the job previously denied. *Ford Motor Co. v. EEOC,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982).[10] However, the employer need not offer the claimant full seniority benefits retroactive to the date of the alleged discrimination. *Id.* If the plaintiff chooses to reject the job offer, any claim to back pay from the time of the rejection forward is barred. *Id.*

### XI. GUIDELINES FOR ESTABLISHING DAMAGES IN THIS CASE

The Court finds as follows:

1. Damages shall be determined on an individual basis, rather than on a class-wide basis, because under the circumstances of this case, individual determinations of damages will be the more accurate and therefore the more equitable remedy for all concerned.

2. All plaintiffs whose claims fall within the following categories should be dismissed for failure to state a claim:

a. individuals actually hired;

b. applicants for positions as cadets who never applied for a job as a police officer; and

c. applicants who failed to continue the application process or who voluntarily withdrew.

3. Evidence regarding a class member's failure to qualify for employment as a City of Dallas police officer under any of the three subsequently validated hiring criteria is admissible evidence in this case because it is relevant to the question of whether a class member qualified for work as a police officer, but was nonetheless denied the job.

4. The City's hiring criteria as of April 26, 1983, as modified by agreement of the

---

10. For further discussion of the issue of back pay liability, the Court directs the parties to the

decision in *EEOC v. Exxon Shipping Co.,* 745 F.2d 967 (5th Cir.1984).

parties,[11] is competent, admissible evidence in this case and therefore may be used by the City in an effort to meet its burden of producing a non-discriminatory reason for its refusal to hire. This is not to suggest, however, that the City is limited to use of only these stipulated criteria in its efforts to meet its burden of production.

■ The court also addresses the issue of attorneys' fees, raised in the parties' briefs to the court on damages. Plaintiffs are entitled to a fee award when they prevail on "any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing the suit." *Texas State Teachers Assn. v. Garland Independent School Dist.*, 489 U.S. 782, 109 S.Ct. 1486, 1491, 103 L.Ed.2d 866 (1989) (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978)). While plaintiffs may be entitled to a fee, they are not automatically entitled to a fee for all services, necessary or not, that counsel performed. *Rendon v. AT & T Technologies*, 883 F.2d 388, 399 (5th Cir.1989). In *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court stated that:

> [I]f ... a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the most critical factor is the degree of success obtained.

*Hensley*, 461 U.S. at 436, 103 S.Ct. at 1941, 76 L.Ed.2d at 52.

■ Finally, the Court recognizes that only equitable relief, including back pay and reinstatement, is available under Title VII. *Miller v. Texas State Board of Barber Examiners*, 615 F.2d 650 (5th Cir.1980) *cert. denied*, 449 U.S. 891, 101 S.Ct. 249, 66 L.Ed.2d 117 (1980). Punitive damages are not available under Title VII. *Perez v. F.B.I.*, 707 F.Supp. 891 (W.D.Tex.1988). ACCORDINGLY,

IT IS ORDERED that the parties shall confer and *jointly* prepare a plan for the orderly and timely completion of this case setting forth the following information in separately numbered paragraphs:

(1) any further legal issues requiring resolution by this Court;

(2) an outline of any additional discovery required to resolve this case and an estimate of the time required to complete the discovery;

(3) the estimated number of claims anticipated to be in dispute thus requiring an evidentiary hearing before a special master[12], if appointed, or before this Court;

(4) any other matter requiring the attention of this court.

Any differences between the parties shall be so noted within the appropriate paragraph. Plaintiffs shall contact the defendant to schedule a mutually acceptable time to confer. The joint plan shall be filed within forty-five (45) days of this order. Sanctions may be imposed for failure to comply with this order.

Upon receipt of the parties' joint plan, the court shall (1) address any matters requiring its attention and (2) determine whether the appointment of a special master is required in this case.

IT IS FURTHER ORDERED that pursuant to Local Rule 9.1(a), the parties shall

---

11. Plaintiffs stipulated that these job requirements were acceptable. *See* injunctive hearing transcript at 3, 4 (April 26, 1983).

12. If the liability of the employer is established through either a trial or a consent decree, a court may appoint a special master pursuant to Rule 53 of the Federal Rules of Civil Procedure to analyze employment discrimination claims and make determinations of the amount of back pay owed to each member of the class. *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 258 (5th Cir.1974). The use of a special master to perform this function is useful and efficient when a court determines that class-wide proof of back pay owing to class members is not feasible and individual proofs are required by individual members to show entitlement to and eligibility for such recovery and to demonstrate facts necessary to show the amount of individual recovery.

negotiate and settle as many claims as possible by applying the guidelines as set forth in this order.

The Court anticipates that a *substantial* number of claims shall be settled without requiring evidentiary hearings before a special master or before this Court. The guidelines to be applied have been made plain. The Court is confident that the parties will proceed in good faith to apply these guidelines to expediently, fully, and fairly resolve this case.

IT IS SO ORDERED.